# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 24-20968-CIV-ALTONAGA/Reid

LISSET INFANTE,

      Plaintiff,

v.

JEWISH COMMUNITY SERVICES
OF SOUTH FLORIDA, INC.,

      Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court upon Defendant, Jewish Community Services of South Florida, Inc.'s Motion for Summary Judgment [ECF No. 38]; and Plaintiff, Lisset Infante's Motion for Partial Summary Judgment [ECF No. 42]. Defendant and Plaintiff each filed respective Responses [ECF Nos. 45, 48]; followed by Replies [ECF Nos. 50, 56]. The Court has carefully considered the record, the parties' written submissions, and applicable law.[1]

## I.  BACKGROUND

Defendant is a nonprofit organization that provides social services to minors. (*See* Pl.'s SOF Exs., Ex. 9, Employee Handbook [ECF No. 35-9] 5–6).[2] Plaintiff worked for Defendant as

---

[1] The parties' factual submissions include Defendant's Statement of Undisputed Material Facts . . . ("Def.'s SOF") [ECF No. 39]; Plaintiff's Statement of Material Facts ("Pl.'s SOF") [ECF No. 41]; Plaintiff's Notice of Filing Exhibits in Relation to Plaintiff's Statement of Facts ("Pl.'s SOF Exs.") [ECF No. 35]; Defendant's Response to Plaintiff's Statement of Material Facts ("Def.'s Resp. SOF") [ECF No. 46]; Plaintiff's Responses to Defendant's Statement of Undisputed Facts . . . ("Pl.'s Resp. SOF") [ECF No. 49]; Plaintiff's Reply to Additional Facts . . . ("Pl.'s Reply SOF") [ECF No. 58]; and Plaintiff's Notice of Filing [ECF No. 47].

[2] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings. Citations to deposition testimony rely on the pagination and line numbering in the original document.

a clinician, providing therapy to minors, from June 2021 to January 2024.  (*See* Pl.'s SOF ¶¶ 1–2; Def.'s Resp. SOF ¶¶ 1–2; *see also* Def.'s SOF ¶ 1; Pl.'s Resp. SOF ¶ 1 (disputed as phrased by Plaintiff on other grounds)).[3]  This case arises from Defendant's alleged failure to properly compensate Plaintiff, in violation of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. section 207(a)(1), and Florida Statutes section 448.08.  (*See generally* Notice of Removal [ECF No. 1], Ex. A, Composite ("Compl.") [ECF No. 1-2] ¶¶ 8–27).

**The PACTT Program.**  Plaintiff worked in Defendant's "Providing Adolescents and Children with Trauma-Focused Treatment" ("PACTT") program.  (*See* Def.'s SOF ¶ 1; Pl.'s Resp. SOF ¶ 1 (disputed as phrased by Plaintiff on other grounds)).  The PACTT program receives federal grant funding.  (*See* Def.'s SOF ¶ 9; Pl.'s Resp. SOF ¶ 9).  The grant comes with certain requirements, including that program counselors have a master's degree in a mental health field and are either a Registered Mental Health Counselor Intern ("RMHCI") or Licensed Mental Health Counselor ("LMHC").[4]  (*See* Def.'s SOF ¶¶ 5–10; Pl.'s Resp. SOF ¶¶ 5–10).  Defendant further requires its PACTT clinicians to have at least three years of clinical experience, including practice with clients who have suffered trauma.  (*See* Def.'s SOF ¶ 3; Pl.'s Resp. SOF ¶ 3).

Per the grant's requirements, clinicians working in the PACTT program must treat at least 75 clients per year.  (*See* Def.'s SOF ¶¶ 13–14; Pl.'s Resp. SOF ¶¶ 13–14 (disputed as phrased)).

---

[3] Plaintiff responds to many of Defendant's statements of material fact by disputing the statements "as phrased."  (*See generally* Pl.'s Resp. SOF; Pl.'s Reply SOF).  The Court considers whether Plaintiff has "clearly challenge[d] any purportedly material fact asserted by" Defendant to evaluate if the fact "is genuinely in dispute."  S.D. Fla. Local R. 56.1(a)(2) (alteration added).

[4] RMHCIs and LMHCs are Florida state designations for mental health counselors.  (*See* Def.'s SOF ¶¶ 5–7; Pl.'s Resp. SOF ¶¶ 5–7).  Both RMHCIs and LMHCs must have a master's level degree in mental health; RMHCIs may become LMHCs when they complete their licensure.  (*See* Def.'s Resp. SOF ¶¶ 35–38; Pl.'s Reply SOF ¶¶ 35–38; *see also* Pl.'s SOF Exs., Ex. 2, Dep. Tr. of Natalie Herradon ("Herradon Dep.") [ECF No. 35-2] 11:8–12:14).  RMHCIs and LMHCs generally perform the same work, although RMHCIs necessarily have less work experience than LMHCs.  (*See* Def.'s SOF ¶ 8; Pl.'s Resp. SOF ¶ 8; *see also* Herradon Dep. Tr. 12:1–14 (noting the "main distinguisher [between a RMHCI and a LMHC] is the experience that the person would have within the field[]" (alterations added)).

Defendant requires its clinicians to see at least 18 clients per week to meet the grant quota. (*See* Pl.'s SOF ¶ 16 ("Plaintiff was first required to see a minimum of 20, then 18, unique clients weekly"); *see also* Def.'s SOF ¶ 12 ("PACTT clinicians, including Plaintiff, were initially expected to each meet with twenty (20) clients per week, and this requirement was later reduced to eighteen (18) clients per week.")).

According to Plaintiff, the grant limited the kind of therapy she could provide as a PACTT program clinician; she asserts she could only employ the Trauma-Focused Cognitive Behavioral Therapy ("TF-CBT") modality in treating clients. (*See* Pl.'s SOF ¶ 6; Def.'s Resp SOF ¶ 6 (disputed by Defendant); *but see* Def.'s SOF ¶ 32 ("As a PACTT clinician, Plaintiff utilized the [TF-CBT] 'modality' for the treatment of her clients." (alteration added)). TF-CBT is a form of therapy that focuses on treatment for individuals who have suffered mental trauma; it provides its practitioners a set of guidelines and recommendations on treating such patients. (*See* Pl.'s SOF Exs., Ex. 1, Pl.'s Dep. Tr. [ECF No. 35-1] 69:9–12; *see also* Def.'s Resp. SOF ¶ 60; Pl.'s Reply SOF ¶ 60).

***Plaintiff's Training and Experience.*** Prior to her employment with Defendant, Plaintiff received a master's degree in Counselor Education, had three years of relevant experience in the mental health field, and was a RMHCI. (*See* Def.'s SOF ¶¶ 16–17, 20, 22; Pl.'s Resp. SOF ¶¶ 16–17, 20, 22; *see also* Pl.'s SOF ¶ 3; Def.'s Resp. SOF ¶ 3). Plaintiff became a LMHC on May 24, 2023, during her employment with Defendant. (*See* Def.'s SOF ¶ 21; Pl.'s Resp. SOF ¶ 21). While working for Defendant, Plaintiff was always paid a salary of at least $979.17 per week. (*See* Def.'s SOF ¶¶ 24–25; Pl.'s Resp. SOF ¶¶ 24–25).

When Plaintiff started working for Defendant, she received TF-CBT-specific training from Defendant's employee, Ricardo Rubiales. (*See* Def.'s SOF ¶ 34; Pl.'s Resp. SOF ¶ 34 (disputed

as phrased by Plaintiff, who states this training was required)). The on-the-job training was conducted over a period of three-and-a-half days, followed by an additional six-month consultation period. (*See* Def.'s SOF ¶ 37; Pl.'s Resp. SOF ¶ 37 (disputed as phrased by Plaintiff, who contends Defendant "required Plaintiff and the other clinicians to attend an extensive six-month virtual training course in order to learn and apply the TF-CBT modality"); *see also* Pl.'s SOF Exs., Ex. 8, Dep. Tr. of Ricardo Rubiales [ECF No. 35-8] 24:3–13).

Plaintiff treated clients during both the training and consultation periods. (*See* Def.'s SOF ¶ 38; Pl.'s Resp. SOF ¶ 38 (disputed as phrased by Plaintiff, who acknowledges she saw patients during this time but states it was under "close supervision")). During the consultation period, Plaintiff met with Rubiales twice per month. (*See* Def.'s SOF ¶ 37; Pl.'s Resp. SOF ¶ 37 (disputed as phrased by Plaintiff on other grounds)). Rubiales never directed Plaintiff on how to diagnose or treat her clients. (*See* Def.'s SOF ¶ 40; Pl.'s Resp. SOF ¶ 40 (disputed as phrased by Plaintiff on other grounds)).

***Plaintiff's Employment Duties.*** While employed by Defendant, Plaintiff's work centered around providing therapy, primarily to adolescents; and working with her clients' parents, families, and caregivers to overcome her clients' mental trauma. (*See* Def.'s SOF ¶¶ 30–31; Pl.'s Resp. SOF ¶¶ 30–31 (disputed as phrased by Plaintiff, who emphasizes this work was performed under the control and supervision of her superiors); *see also* Compl. ¶ 11). Plaintiff's duties included: screening clients; providing weekly therapy sessions; scheduling client sessions; diagnosing her clients; making treatment plans; recommending when clients had finished the PACTT program; making referrals to outside psychiatrists; completing documentation regarding her clients; and attending weekly meetings with her direct supervisor, Christina Lalama. (*See* Def.'s SOF ¶¶ 44, 52, 54, 56, 59, 62–63, 65, 67; Pl.'s Resp. SOF ¶¶ 44, 52, 54, 56, 59, 62–63, 65, 67 (all except ¶ 62

disputed as phrased by Plaintiff, who emphasizes her duties were performed under close supervision and monitoring)).

No supervisor was routinely present with Plaintiff while she conducted client screenings or therapy sessions. (*See* Def.'s SOF ¶¶ 45, 68; Pl.'s Resp. SOF ¶¶ 45, 68 (disputed as phrased by Plaintiff, who asserts Lalama was responsible for final screening decisions, and Plaintiff was required to bring any client issues to her supervisor). The parties disagree as to the level of supervision for essentially every other one of Plaintiff's job responsibilities. (*See, e.g.*, Def.'s SOF ¶¶ 44–70; Pl.'s Resp. SOF ¶¶ 44–70).

Plaintiff argues many, if not all, of her job duties required approval from her supervisors. (*See* Pl.'s SOF ¶¶ 11–13, 18–19; Def.'s Resp. SOF ¶¶ 11–13, 18–19 (disputed by Defendant)). For example, Plaintiff's supervisors purportedly monitored her notes (*see* Pl.'s SOF ¶ 19; Def.'s Resp. SOF ¶ 19 (disputed by Defendant, who nevertheless states Lalama had access to Plaintiff's notes)); and had final approval over Plaintiff's screening decisions (*see* Pl.'s SOF ¶¶ 11, 14; Def.'s Resp. SOF ¶¶ 11, 14 (disputed by Defendant)), treatment plans (*see* Def.'s SOF ¶ 62; Pl.'s Resp. ¶ 62), diagnoses (*see* Def.'s SOF ¶ 55; Pl.'s Resp. SOF ¶ 55 (disputed as phrased by Plaintiff, who contends Lalama had to give final approval of diagnoses)), and decisions to discharge clients from the PACTT program (*see* Def.'s SOF ¶ 61; Pl.'s Resp. SOF ¶ 61 (disputed as phrased by Plaintiff, who says the ultimate decision rested with Lalama)).

***The Claims and Defenses.*** Plaintiff alleges two claims for relief against Defendant: (1) failure to pay Plaintiff overtime wages, in violation of the FLSA; and (2) failure to pay Plaintiff the proper amount of standard wages under Florida Statutes section 448.08 and Florida common law. (*See* Compl. ¶¶ 8–27). Defendant filed an Amended Answer and Affirmative Defenses to Plaintiff's Complaint [ECF No. 21] asserting affirmative defenses, including that Plaintiff was a

learned professional, and Defendant acted in good faith to comply with the FLSA.  (*See id.* 5–6).
Defendant now moves for final summary judgment, and Plaintiff moves for partial summary
judgment.  (*See generally* Def.'s Mot; Def.'s Reply; Pl.'s Mot.; Pl.'s Reply).

## II.  LEGAL STANDARD

 "A party may move for summary judgment, identifying each claim or defense — or the
part of each claim or defense — on which summary judgment is sought."  Fed. R. Civ. P. 56(a).
"The principles governing summary judgment do not change when the parties file cross-motions
for summary judgment[,]" as is the case here.  *T–Mobile S. LLC v. City of Jacksonville*, 564 F.
Supp. 2d 1337, 1340 (M.D. Fla. 2008) (alteration added).

Summary judgment may be rendered if the pleadings, discovery and disclosure materials
on file, and any affidavits show there is no genuine dispute of any material fact and the movant is
entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c).  An issue of fact is "material"
if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 248 (1986).  A dispute of fact is "genuine" if the evidence could lead a
reasonable jury to find for the non-moving party.  *See id.*; *see also Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The Court draws all reasonable
inferences in favor of the party opposing summary judgment.  *See Chapman v. AI Transp.*, 229
F.3d 1012, 1023 (11th Cir. 2000) (citations omitted).

If the moving party bears the burden of proof on the relevant issue at trial, it can meet its
summary judgment burden only "by presenting *affirmative* evidence showing the absence of a
genuine issue of material fact — that is, facts that would entitle it to a directed verdict if not
controverted at trial."  *Emery v. Talladega Coll.*, 169 F. Supp. 3d 1271, 1280–81 (N.D. Ala. 2016)
(emphasis in original; citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)),

*aff'd*, 688 F. App'x 727 (11th Cir. 2017).  With that showing made, the moving party "is entitled to summary judgment unless the non-moving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact."  *Fitzpatrick*, 2 F.3d at 1115 (alteration adopted; quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc)).

In contrast, if the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment by: (1) establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim and (2) showing the court there is insufficient evidence to support the non-moving party's case.  *See Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14209-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015).  "Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute."  *Id.* (alteration added; quotation marks omitted; quoting Fed. R. Civ. P. 56(c)(1)).  When considering cross-motions for summary judgment, the court views the facts in the light most favorable to the non-moving party on each motion.  *See Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012) (citations omitted).

### III.  DISCUSSION

Defendant moves for summary judgment on both of Plaintiff's claims, arguing that Plaintiff's employment was that of a learned professional and, therefore, Plaintiff is not entitled to overtime pay under the FLSA (*see generally* Def.'s Mot.); Defendant also belatedly argues that Plaintiff's state-law claim under section 448.08 is "derivative" of her FLSA claim and cannot stand on its own (*see* Def.'s Reply 10).  Plaintiff asserts there is no genuine dispute of fact that she was *not* a learned professional, Defendant violated the FLSA when it failed to pay her overtime wages,

and Defendant's good faith defense to liquidated damages fails. (*See generally* Pl.'s Mot.; Pl.'s Resp.). Plaintiff also argues she is entitled to recover unpaid wages, as a matter of state law, for working through her daily breaks. (*See generally id.*).

### A. FLSA Claim

The FLSA requires employers to compensate employees at a rate of one and one-half times the employee's regular rate of pay for each hour over 40 hours worked per week. *See* 29 U.S.C. § 207(a)(1). This requirement does not apply to an employee who is employed "in a bona fide . . . professional capacity[,]" 29 U.S.C. § 213(a)(1) (alterations added), otherwise known as a learned professional, *see* 29 C.F.R. § 541.301 (2024). Exemptions to the FLSA, such as the learned professional exemption, are construed narrowly, and Defendant bears the burden of establishing it is entitled to the exemption. *See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1156 (11th Cir. 2008).

Both parties seek summary judgment based on the learned professional exemption to the FLSA. (*See* Def.'s Mot. 7–20; Pl.'s Mot. 2–11). According to Defendant, it is entitled to a ruling that the learned professional exemption applies to Plaintiff as a matter of law based on undisputed material facts. (*See, e.g.*, Def.'s Mot. 2). Plaintiff, in contrast, contends summary judgment should be granted in her favor because she has shown the exemption categorically does not apply to her on material, undisputed facts. (*See, e.g.*, Pl.'s Mot. 1).

"How an employee spends her time working is a question of fact[.]" *Langley v. Gymboree Operations, Inc.*, 530 F. Supp. 2d 1297, 1301 (S.D. Fla. 2008) (alteration added; citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)); *see also Talbott v. Lakeview Ctr., Inc.*, No. 06-cv-378, 2010 WL 11557948, at *7 (N.D. Fla. Feb. 2, 2010) (noting that "[a]lthough the inquiry into whether the professional exemption applies is extremely fact bound and case specific,

. . . the court focuses on the duties and requirements of the occupation, not the personal qualifications of the employee . . . ." (alterations added; citations omitted). "Whether an employee's particular activities exclude them from the overtime benefits of the FLSA is a question of law[.]" *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 677 F. Supp. 2d 544, 551 (D. Conn. 2009) (quotation marks omitted; alteration adopted; additional alteration added; quoting *Icicle Seafoods*, 475 U.S. at 714). "At the same time, disputes regarding the nature of an employee's duties are questions of fact." *Id.* (quotation marks omitted; alteration adopted; quoting *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1081 (8th Cir. 2000); other citation omitted).

### 1. Professional Exemption

To fall under the professional exemption, an employee must be salaried[5] and paid a minimum amount per week, s*ee* 29 C.F.R. § 541.600(a), as well as primarily perform "work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction[,]" 29 C.F.R. § 541.301(1) (2024) (alteration added). The Code of Federal Regulations provides a list of occupations which generally meet the requirements of the learned professional exemption. *See* 29 C.F.R. §§ 541.301 (d), (e) (2024) (noting nurses, dental hygienists, physician assistants, accountants, paralegals, and chefs, among others, can generally be considered learned professionals if the position requires specialized academic training). While therapists, mental health counselors, and clinicians are not specifically listed, there is a "catch all" section, which states, "[t]he areas in which the professional exemption

---

[5] An employee is "paid on a 'salary basis' . . . if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a) (alteration added).

may be available are expanding[]" as more occupations acquire the "characteristics of a learned profession." *Id.* §§ 541.301 (e), (f) (2024) (alterations added).

To determine whether Plaintiff falls within the exemption, then, the Court first considers whether Plaintiff was "compensated on a salary basis" at a rate of at least $684 per week. *Id.* § 541.600(a).[6] The Court next evaluates if Plaintiff's primary duty — the determination of which "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole" *id.* § 541.700(a) (2024) — involved work requiring advanced knowledge in a field of science or learning that is "customarily acquired by a prolonged course of specialized intellectual instruction[,]" *id.* § 541.301(a) (2024) (alteration added).

### a.  Salary

It is undisputed Plaintiff was paid on a salary basis, and that she was paid a salary of at least $979.17 per week throughout her employment. (*See* Def.'s SOF ¶¶ 24–25; Pl.'s Resp. SOF ¶¶ 24–25). Although Plaintiff concedes she was salaried and paid above the minimum weekly amount required by the regulations, she argues her "modest salary" shows she is the kind of employee meant to be protected by the FLSA. (Pl.'s Resp. 8–9 (emphasis and footnote call number omitted)). Plaintiff relies on *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012), where the Supreme Court, in addressing another FLSA exemption, noted "[t]he exemption is

---

[6] Plaintiff brings this action to recover alleged overtime and unpaid wages for her work spanning from June 25, 2021 through January 8, 2024. (*See* Compl. ¶ 11). In June 2021, 29 C.F.R. section 541.600(1) required employees to be paid at least a $684 per week salary to qualify as a professional employee. *See id.* (2021). This $684 per week requirement remained through the end of Plaintiff's employment with Defendant. *See id.* (2024). Effective July 1, 2024, the Department of Labor increased the rate to $844 per week. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, 89 Fed. Reg. 32842 (Apr. 26, 2024) (to be codified at 29 C.F.R. Part 541). This rate will increase again beginning January 1, 2025. *See id.*

premised on the belief that exempt employees 'typically earned salaries well above the minimum wage[.]'" *Id.* at 166 (alterations added; citation omitted); (*see also* Pl.'s Resp. 8 n.5 (citing same)).

Plaintiff earned well above both the federal and Florida minimum wages.  (*Compare* Def.'s SOF ¶ 24; Pl.'s Resp. SOF ¶ 24 (stating Plaintiff's starting salary was $979.17 per week) *with* 29 U.S.C. § 206 (federal minimum wage of $7.25 an hour, or approximately $290 per week assuming a 40-hour work week), Fla. Const. art. X, § 24(c) (Florida minimum wage spanning between $10.00 an hour by late 2021, or approximately $400 per week; and $12.00 an hour by January 2024, or approximately $480 per week, assuming same)).  Further, the Court does not agree with Plaintiff's proposition that because the petitioners in *Christopher* — who made an average of over $70,000 annually — were found to be exempt from the FLSA's overtime requirements, that an employee such as Plaintiff making *under* $70,000 is automatically within the realm of employees the FLSA was intended to protect.  *See* 567 U.S. at 166; (*see also* Pl.'s Resp. 8–9).

Still, the Court finds that a jury could consider Plaintiff's salary in analyzing Plaintiff's employment, as "employment for FLSA purposes is a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances."  *Hendricks*, 677 F. Supp. 2d at 551 (alteration adopted; quoting *Barfield v. N.Y. City Health and Hosps. Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008); *see Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1211–12 (11th Cir. 2015) (citing the Second Circuit's "flexible" approach with approval).

### b. Primary Duty

An employee's primary duty is "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a) (2024).  "Factors to consider when determining the primary duty of an employee include, . . . the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; [and] *the employee's*

*relative freedom from direct supervision* . . . ." *Id.* (alterations and emphasis added). "To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." *Id.* § 541.301(a) (2024). There are three elements to the primary duty test: "(1) [t]he employee must perform work requiring advanced knowledge; (2) [t]he advanced knowledge must be in a field of science or learning; and (3) [t]he advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." *Id.* (alterations added).

The parties agree Plaintiff's primary duty was providing mental health services to her clients — children and adolescents who had experienced trauma (*See* Def.'s Mot. 8 (stating "Plaintiff's work as a clinician for [Defendant]" was to "provid[e] mental health treatment to children and adolescent clients who ha[d] experienced trauma . . . ." (alterations added; emphasis omitted)); *see also* Pl.'s Resp. 16 (describing Plaintiff's work as the "treatment of traumatized youth")). Plaintiff's work was centered around her clients, and her primary duty was providing therapy to children and adolescents who had experienced trauma. *See* 29 C.F.R. § 541.700(a) (2024) (alterations added).

***Advanced Knowledge.*** Under the first element, Defendant bears the burden of proving that Plaintiff's primary duty was "work requiring advanced knowledge," which means "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical[,] or physical work." *Id.* § 541.301(b) (2024) (alteration added). "The regulations make clear that the advanced knowledge must not merely be held by the employee[,] but it also must be *required* for the employee to perform the job." *Talbott v. Lakeview Ctr., Inc.*, No. 06-cv-

378, 2008 WL 4525012, at *7 (N.D. Fla. Sept. 30, 2008) (alteration added; emphasis in original; citing 29 C.F.R. § 541.301(a)(1)).

Defendant argues Plaintiff's position as a clinician regularly required her to utilize advanced knowledge, independent judgment, and discretion. (*See* Def.'s Mot. 8–16). Plaintiff insists that her work was "routine" and did not involve the consistent exercise of discretion. (Pl.'s Resp. 9 (citations omitted)).

The parties strenuously disagree as to the degree and nature of supervision that Plaintiff was subjected to. Plaintiff presents evidence — which Defendant disputes — of a multi-tiered supervisory structure and argues these supervisors had the ability to overturn nearly all of her decisions. (*See, e.g.*, Pl.'s Mot. 2 (describing the "the multi-tiered and constant supervision imposed by [Defendant] over virtually every meaningful aspect of [Plaintiff's] work as a clinician" (alterations added)). Plaintiff contends she was constrained to use the TF-CBT modality and pre-printed forms; was assigned clients and set hours, as well as subjected to a client quota; further, her supervisors instructed her on treating her clients and made decisions regarding whether Plaintiff could continue to see her clients. (*See* Pl.'s SOF ¶¶ 6; 12, 15–18, 21–23, 26; *but see* Def.'s Resp. SOF ¶¶ 6, 12, 15–18, 21–23, 26 (disputing same)).

Defendant notes Plaintiff's work "involved screening, assessing, and diagnosing clients, and formulating and carrying out treatment plans for each client." (Def.'s Mot. 9 (citations and emphasis omitted)). Defendant points out that Plaintiff used her discretion and judgment to assess and diagnose her clients, make treatment plans, and conduct sessions with clients. (*See* Def.'s SOF ¶¶ 44, 52, 56, 59; *but see* Pl.'s Resp. SOF ¶¶ 44, 52, 56, 59 (disputed as phrased by Plaintiff); *see also* Def.'s Mot. 11 (describing Plaintiff's purportedly independent duties)). Indeed, Defendant emphasizes that Lalama never told Plaintiff "how she needed to treat a client, nor could

she, as []Lalama did not have the personal information about each client of [Plaintiff's] (or any other therapist)." (Def.'s Mot. 12 (alterations added; citing Def.'s SOF ¶ 68)). Further, Defendant highlights that "Plaintiff was not supervised on a daily basis[,] and her supervisor was not involved in her day-to-day meetings with[,] and treatment of[,] clients." (*Id.* 13 (alterations added; citing Def.'s SOF ¶¶ 67–68; emphasis omitted)).

Defendant relies on *Levine v. Unity Health System*, 847 F. Supp. 2d 507 (W.D.N.Y. 2012), for its position that Plaintiff's primary duty as a clinician required advanced knowledge. (*See* Def.'s Mot. 9). In *Levine*, three plaintiffs sought overtime pay for their work as "[p]rimary [t]herapists . . . in the area of mental health counseling and therapy." 847 F. Supp. 2d at 508 (alterations added). As here, the primary duties of the therapists in *Levine* included assessing patients' conditions, making treatment plans and diagnoses, and leading therapy sessions. *See id.* at 510–11. The *Levine* court determined the therapist-plaintiffs were learned professionals, finding they consistently exercised discretion despite only making initial assessments, which could be overturned by supervisors. *See id.* at 510–12.

Defendant argues that some degree of supervision did not rob Plaintiff of her responsibility to consistently use her advanced knowledge and exercise her own discretion. (*See* Def.'s Mot. 9 (collecting cases)). This proposition may well be true. Yet, there is a key difference: in *Levine*, it was undisputed that the plaintiffs performed their tasks with "little oversight[.]" 847 F. Supp. 2d at 511 (alteration added). Plaintiff's assertion that she was subjected to *extensive* supervision distinguishes this case from the undisputed facts in *Levine* and case law premised on *limited* supervision. (*See* Def.'s Mot. 11 (citing *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 526 (5th Cir. 1999) (noting that the employees only "sometimes" acted "under the supervision of a physician")); *see also* Pl.'s Dep. Tr. 129:2–17 (Plaintiff noting her treatment plans would only

14

be marked "pending" until they were approved by a supervisor); Pl.'s SOF ¶¶ 11, 12 (stating it was Plaintiff's supervisors who determined if a client was eligible for, or finished with, the PACTT program); *but see* Def.'s Resp. SOF ¶¶ 11, 12 (disputing same)).

These material, contradictory facts call into question the level of supervisory oversight Plaintiff was subject to, and the effect this supervision had on Plaintiff's independent judgment. *See Cameron v. Abercrombie & Fitch Co.*, No. 10-cv-631, 2012 WL 4057240, at *9 (S.D. Ohio Sept. 14, 2012) (noting both parties disputed the degree to which the plaintiff was able to exercise her independent decision making, and thus summary judgment on professional exemption was improper); *see also Price v. Gulf Coast Jewish Fam. Servs., Inc.*, No. 05-cv-2210, 2006 WL 3391246, at *3 (M.D. Fla. Nov. 22, 2006) (declining to grant summary judgment in favor of the defendant on the learned professional exemption where the "[p]laintiff's deposition contain[ed] many conflicting, statements regarding the *degree* of discretion or judgment he exercised in his position" (alterations added; emphasis original; citation omitted)).

Thus, "even assuming that *some* 'advanced knowledge' was required of" Plaintiff during her employment with Defendant, given the disputed level of supervision and oversight exercised by Plaintiff's supervisors, and the disputes over the level of discretion retained by Plaintiff, "it is unclear whether [Plaintiff] *primarily* performed work requiring advanced knowledge." *Hendricks*, 677 F. Supp. at 553 (alteration added; emphases original).

**Field of Science or Learning.** "The phrase 'field of science or learning' includes the traditional professions of law, medicine, theology, accounting, . . . and other similar occupations that have a recognized professional status[.]" 29 C.F.R. § 541.301(c) (2024) (alterations added). These professions are "distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning."

*Id.*  The parties seem to agree that mental health counseling — in the abstract — *could* qualify as a field of science or learning.  (*See* Def.'s Mot. 16; Pl.'s Resp. 9 (challenging the proposition that Plaintiff's primary duty was in a field of science or learning)).  But that is not the question presented here.  Instead, "the parties' disagreement is ultimately as to the nature of plaintiff['s] *role*[] within the larger field of" mental health counseling.  *Hendricks*, 677 F. Supp. at 555 (alterations added; emphasis original).

If Plaintiff's *role* required advanced knowledge of mental health counseling, it would follow that her employment was in a field of science or learning.  Again, however, the parties do not agree as to what exactly Plaintiff's role was with Defendant, and whether that role was essentially mechanical, and taught to her after she began working for Defendant; or discretionary, and based on her past education in mental health.

Defendant posits Plaintiff's role required advanced knowledge in a field of science or learning, as "Plaintiff's job as a mental health clinician required, and Plaintiff did complete, a Master's degree in mental health and professional status recognized by the State of Florida, first as an RMHCI and later as an LMHC."  (Def.'s Mot. 16 (citation omitted)).  Plaintiff, in contrast, argues her role did not require knowledge in a field of science or learning because she was merely taught steps to follow, and supervisors controlled her job duties.  (*See, e.g.*, Pl.'s Resp. 9–11).  Since disputes of material fact exist over whether Plaintiff's role required advanced knowledge in the field of mental health counseling, the Court cannot say whether the second element of the primary duty test is met.

**Prolonged Course of Specialized Intellectual Instruction.**  "The phrase 'customarily acquired by a prolonged course of specialized intellectual instruction' restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the

profession." 29 C.F.R. § 541.301(d) (2024).  Defendant argues Plaintiff fulfills this element, as Plaintiff has a master's degree in Counselor Education, and Defendant required its PACTT clinicians to have a mental-health-related master's degree.  (*See* Def.'s Mot. 17).  Plaintiff, meanwhile, contends her master's degree was not sufficiently specialized to her work for Defendant, because in her master's program she was not required to have any training in treating minors who had suffered trauma or in the TF-CBT modality.  (*See* Pl.'s Mot. 10).  Plaintiff asserts her post-employment training in TF-CBT further buttresses this fact, because the work she performed was informed by her three-day on-the-job training, not her master's degree education.  (*See* Pl.'s Resp. 13–14).

Plaintiff states she followed "a detailed step by step" guide to perform the TF-CBT modality, which she was taught over a period of three days on the job; she further asserts it was this training, not a master's degree, that was the specialized instruction that prepared PACTT clinicians to give therapy to minors who had suffered trauma.  (Pl.'s Dep. Tr. 70:8–12).  As Defendant points out, however, Plaintiff also says PACTT clinicians used knowledge acquired during their education for their master's degree — which was a job requirement.  (*See id.* ("[W]e learned it in our master's degree, but really [Lalama] was the one that provided us a detailed step by step of each of the steps within the [TF-CBT] modality that we were supposed to do with each of the clients." (alterations added); Def.'s SOF ¶¶ 33, 56; Pl.'s Resp. SOF ¶¶ 33, 56 (disputed as phrased by Plaintiff); *see also* Pl.'s Dep. Tr. 120:8–23, 125:21–24).  These conflicting pictures of what specialized knowledge was required to enter the profession as a clinician performing the tasks required during employment for Defendant prevents a summary judgment in favor of either party.

In all, the facts proffered by both parties indicate "a genuine issue of material fact as to whether Plaintiff exercised discretion and independent judgment in her primary duties" and thus

summary judgment for or against Plaintiff or Defendant on the learned professional exemption is precluded. *Cameron*, 2012 WL 4057240, at *7.

### 2. FLSA Overtime Liability

The Court next turns to Plaintiff's remaining arguments regarding her FLSA claim. Plaintiff argues liability against Defendant has been established on her claim of unpaid overtime and that Defendant is not entitled to its good faith defense against liquidated damages as a matter of law. (*See* Pl.'s Mot. 11–14). Defendant insists that even if Plaintiff can show liability as to her FLSA claim, her claim still fails because there is no evidence of damages. (Def.'s Resp. 16–18). The Court addresses each argument in turn.

### a. Liability

Plaintiff argues she is entitled to a finding that Defendant is liable under the FLSA to pay her overtime wages. (*See* Pl.'s Mot. 1, 14, 16). In order to establish FLSA liability, Plaintiff must "demonstrate (1) [she] worked overtime without compensation and (2) Defendant[] knew or should have known of the overtime work." *Romero v. Latin Grp., Inc.*, No. 18-25319-Civ, 2019 WL 7376769, at *1 (S.D. Fla. Oct. 18, 2019) (alterations added; citing *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314–15 (11th Cir. 2007)).

As the Court has discussed, material issues of fact exist as to whether Plaintiff is exempt from the FLSA's overtime provisions. As a result, the Court cannot find Defendant liable (or, for that matter, not liable) for Plaintiff's overtime wages as a matter of law. *C.f. Sigida v. Munroe Foods 2 LLC*, No. 14-cv-3968, 2016 WL 7239952, at *8 (N.D. Ga. Dec. 15, 2016) ("As there exists a genuine issue of material fact as to whether [p]laintiff fell within the administrative or executive exemptions, the [c]ourt has not determined that [d]efendants are liable for overtime pay." (alterations added)).

### b.  Good Faith Defense

Plaintiff moves for summary judgment on Defendant's good faith affirmative defense against liquidated damages on Plaintiff's FLSA claim.  (*See* Pl.'s Mot. 11–12; Pl.'s Reply 8). Plaintiff argues there is no dispute of fact as to whether Defendant acted in good faith in its belief that Plaintiff was an exempt employee.  (*See id.*).

The "good faith" defense to liquidated damages allows a court to refrain from entering liquidated damages against a defendant if the defendant can show that "the act or omission giving rise to such action was in good faith and that [it] had reasonable grounds for believing that [its] act or omission . . . was not a violation of the [FLSA.]"  29 U.S.C. § 260 (alterations added).  The defense only comes into play on a finding of liability.  *See Cusumano v. Maquipan Int'l, Inc.*, 390 F. Supp. 2d 1216, 1223 (M.D. Fla. 2005) (stating "that only a violation of the FLSA results in a right to liquidated damages under the Act" (alteration adopted; quotation marks omitted; quoting *Atlanta Pro. Firefighters Union, Loc. 134 v. City of Atlanta*, 920 F.2d 800, 806 (11th Cir. 1991))).

As issues of fact preclude summary judgment in Plaintiff's favor on her overtime claim, summary judgment precluding the good faith defense is not appropriate.  *See id.* (noting that "[i]n the absence of a determination of an FLSA violation, consideration of the issue of liquidated damages, and thus the associated affirmative defense of good faith, is premature" (alteration added)).

### c.  Damages

Defendant responds to Plaintiff's request for summary judgment on her claim for overtime wages by contending that — even assuming Plaintiff is entitled to summary judgment — the claim still must fail because she has not shown damages.  (*See* Def.'s Resp. 16, 20).  Defendant argues Plaintiff cannot "recall the *specific* number of hours she worked for [Defendant] in any particular

week, or the *specific* amount of time she claims to have worked on her monthly documentation[.]" (*Id.* 16 (alterations added; emphases in original; citation omitted)).  Defendant argues that not only is Plaintiff *not* entitled to summary judgment, but Defendant should instead be granted summary judgment.  (*See id.* 16–18).

True, as Defendant notes, an employee "has the burden of proving that [s]he performed work for which [s]he was not properly compensated."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) (alterations added), *superseded by statute on other grounds as stated in Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 226 (2014).  "When the employer has kept proper and accurate records[,] the employee may easily discharge h[er] burden by securing the production of those records."  *Id.* (alterations added). Yet, "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes[,]" a relaxed burden-shifting scheme applies.  *Id.* (alteration added); *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1278–79 (11th Cir. 2008).

Defendant does not assert its records reflecting Plaintiff's work hours even exist.  (*See generally* Def.'s Mot.; Def.'s Resp.; Def.'s Reply); *see also Allen*, 495 F.3d at 1315 (noting "[i]t is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment" (alteration added; citation omitted)).  Defendant's corporate representative testified that Defendant's clinicians were not required to keep track of their working hours.  (*See* Herradon Dep. Tr. 151:11–12, 162:1–4 (stating "[Plaintiff] was not required to track her hours" and "[t]here is no need to document additional hours outside of 40, because the wages would have covered the time worked" (alterations added))).  Because Defendant's records fail to establish what hours Plaintiff worked and for which weeks, they are not "proper and accurate."

*Allen*, 495 F.3d at 1315 (citation omitted).  Plaintiff may therefore prove her damages under the relaxed burden-shifting scheme.

Under the relaxed burden-shifting scheme, an employee carries her burden to prove damages if she: (a) "proves that [she] has in fact performed work for which [she] was improperly compensated"; and (b) "produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687 (alterations added).  If the employee satisfies her burden, the burden shifts to the employer to produce "evidence of the precise amount of work performed" or to negate "the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688–89; *see also Allen*, 495 F.3d at 1316.

Plaintiff has demonstrated she worked hours for which she was not properly compensated.  Plaintiff testified she worked eight hours overtime every month to complete time-sensitive client charts and subsequently email the charts to Lalama.  (*See* Pl.'s Dep. Tr. 68:15–71:14; *see also* Pl.'s SOF ¶ 29; *but see* Def.'s Resp. SOF ¶ 29 (disputed by Defendant)).  Plaintiff also proffers email evidence showing she sent these client charts to Lalama after Plaintiff's typical working hours.  (*See* Pl.'s SOF Exs., Ex. 10, Pl.'s Off the Clock Emails [ECF No. 35–10] 1–3).

Plaintiff must provide "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687.  Plaintiff contends she worked 8 extra hours every month — in addition to her 40-hour workweek — during the time she worked for Defendant. (*See* Pl.'s Dep. Tr. 48:22–49:11; *see also* Pl.'s SOF ¶ 29; *but see* Def.'s Resp. SOF ¶ 29 (disputing same)).  Whether eight hours of overtime a month is a reasonable inference to draw from the evidence is not a determination for the Court to make at summary

judgment; rather "it is the duty of the trier of facts to draw whatever reasonable inferences can be drawn from the employee['s] evidence[.]" *Anderson*, 328 U.S. at 693 (alterations added).  The determination of exactly how many hours Plaintiff was improperly compensated is therefore a question of fact.

### B.  State-Law Claim for Unpaid Wages

Plaintiff contends she had an employment agreement with Defendant that entitled her to an hourly lunch break every day, which she was unable to take due to a heavy workload.[7]  (*See* Pl.'s Mot. 14–16).  Thus, Plaintiff argues she worked an extra hour each day without compensation and seeks relief under Florida Statute section 448.08.  (*See id.*).  Defendant asserts there is a genuine dispute of "fact as to whether Plaintiff was able to take a one-hour lunch break each day, and therefore summary judgment is inappropriate on this issue.  (Def.'s Resp. 20).  The Court agrees with Defendant.

The parties clearly do not agree whether Plaintiff was able, or entitled, to take a one-hour break.  (*See* Pl.'s SOF ¶¶ 27–28; *but see* Def.'s Resp. SOF ¶¶ 27–28 (disputed by Defendant, who argues Plaintiff could have taken a break but chose not to)).  While Plaintiff insists she was regularly unable to take a break, Defendant's other employees dispute this.  (*See* Herradon Dep. Tr. 232:5–233:11 (asserting that clinicians had the discretion to set their own schedule and could schedule themselves a one-hour break); *see also* Pl.'s SOF Exs., Ex. 4, Dep. Tr. of Christina Lalama 118:11–15 (stating "I believe, if I recall, her words were, I worked through my break, not I'm unable to take my break")).  Thus, summary judgment is inappropriate.

---

[7] Defendant argues Plaintiff does not plead a breach-of-contract claim for unpaid wages.  (*See* Def.'s Resp. 19).  The Court agrees.  The Complaint states Count II is brought under Florida Statutes section 448.08, which courts have construed as a claim for unpaid wages under Florida common law; the Court assesses the claim under this framework only.  (*See* Compl. ¶¶ 23, 26); *see also Perez v. Mediglez Wellness Ctr., Inc.*, No. 12-cv-2751, 2013 WL 5566183, at *4 (M.D. Fla. Oct. 8, 2013) (collecting cases).

Finally, Defendant also requests summary judgment on Plaintiff's state-law claim. Defendant does not address Plaintiff's claim under Florida Statutes section 448.08 in its Motion. (*See generally* Def.'s Mot.).  In its Reply, Defendant first argues the claim cannot stand alone, as it is "derivative" of Plaintiff's FLSA claim and should be dismissed if the Court finds Plaintiff was an exempt employee.  (*See* Def.'s Reply 10).  Defendant cites no authority for this assertion and raises it for the first time in its Reply.  (*See generally* Def.'s Mot.; Def.'s Reply); *see also ripKurrent LLC v. Richard Ballard IRA LLC*, 530 F. Supp. 3d 1281, 1297 (S.D. Fla. 2021) (arguments "raised for the first time in the reply brief are deemed waived" (quoting *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009))).

In any event, as the Court has declined to enter summary judgment finding Plaintiff was an exempt employee, the Court declines to grant Defendant's Motion as to Plaintiff's state-law claim.

## IV.  CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendant, Jewish Community Services of South Florida Inc.'s Motion for Summary Judgment **[ECF No. 38]** and Plaintiff, Lisset Infante's Motion for Partial Summary Judgment **[ECF No. 42]** are **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 12th day of December, 2024.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

23